Order Entered.

Patrick M. Flatley
United States Bankruptcy Judge
Dated: Monday, March 26, 2007 2:50:15 PM

# THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| JOSEPH S. SAPP, | ) | Case No. 05-6643 |
| | ) | |
| Debtor. | ) | Chapter 7 |
| _____ | ) | |
| | ) | |
| BAYER EMPLOYEES FEDERAL CREDIT UNION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 06-10 |
| | ) | |
| JOSEPH S. SAPP, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |
| | ) | |
| MARTIN P. SHEEHAN, TRUSTEE | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Proc. No. 06-63 |
| | ) | |
| RAY S. SAPP, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | | |

## MEMORANDUM OPINION

Bayer Employees Federal Credit Union ("Bayer") filed an adversary complaint against Joseph S.

Sapp (the "Debtor") to except a $21,803 debt[1] from the Debtor's Chapter 7 discharge, pursuant to 11 U.S.C. § 523(a)(2)(B), on the grounds that the Debtor submitted a materially false loan application to Bayer for the purpose of purchasing a mobile home. Based, in part, on the information contained in the Debtor's loan application, Bayer extended the Debtor credit to buy the mobile home, and the Debtor placed the title to the mobile home in his name, as well as his father, Ray Sapp. The parties agree that Bayer did not timely perfect its interest in the mobile home and that Bayer's security interest may be avoided by Martin P. Sheehan, the Debtor's Chapter 7 trustee (the "Trustee"). In turn, the Trustee filed an adversary complaint against Ray Sapp to avoid his interest in the mobile home on the basis that the transfer of an interest to him was fraudulent pursuant to § 548 of the Bankruptcy Code.

The court administratively consolidated these two adversary proceedings for trial, which was held on January 8, 2007, in Wheeling, West Virginia, at which time the court took the matter under advisement pending post-trial briefing by the parties.[2] That briefing is now complete, and for the reasons stated herein, the court will except the debt owed to Bayer from the Debtor's Chapter 7 discharge, and grant the relief sought by the Trustee in avoiding Ray Sapp's interest in the mobile home. Ray Sapp will, however, have a period of time to submit an administrative claim pursuant to 11 U.S.C. § 503(b)(1) and Fed. R. Bankr. P. 3002(c)(3) concerning expenses incurred in preserving the mobile home as property of the Debtor's bankruptcy estate.

## I. BACKGROUND

On September 2, 2005, the Debtor spoke with Barbara Arman, a loan processor at Bayer, about obtaining a $20,000 loan to purchase a mobile home. As a result of that conversation, Ms. Arman completed a credit application on behalf of the Debtor, based, as she testified, on information directly relayed to her by the Debtor. The credit application reflects that the Debtor is a pipeliner and a laborer for the Pipeliner's Union 798 (the "Union") in Tulsa, Oklahoma, and that he had been "employed" by the Union for a period of four years. The credit application also reflects that the Debtor's gross monthly salary

---

[1] Sandra Kay Harper, Bayer's bankruptcy collector, testified that the balance owed to Bayer as of the date of trial was $21,803. The amount owed is not controverted by the Debtor.

[2] The Debtor and Ray Sapp represented themselves at the trial.

-2-

was $3,000. Ms. Arman testified that she wrote in the $3,000 monthly salary amount based on her conversation with the Debtor about his annual income. Ms. Arman further stated that she asked the Debtor – when he came into the office to sign the credit application – to provide proof of his income. The Debtor signed the credit application on September 6, 2005, but did not provide Ms. Arman with proof of his income at that time.

Based on the information in the Debtor's credit application, Bayer calculated his debt to income ratio at 0.326, and it requested a copy of his credit report, which listed his credit score as 718. Investigating the value of the mobile home that the Debtor intended to purchase, Bayer estimated that it was worth over $23,000; thus, if properly perfected, Bayer's loan to the Debtor may be fully secured. Based on this information, Bayer approved the Debtor for the requested $20,000 loan.

When the Debtor came into Bayer's office on September 6, 2005, to sign his credit application, he also signed the loan document, security agreement, and disclosure statement. Notwithstanding the fact that the Debtor had not provided proof of income on September 6, 2005, Bayer decided to make the loan because Ms. Arman "trusted" that the Debtor was telling her the truth about his annual income. The first loan payment of $225 was due on December 18, 2005.

The mobile home purchased by the Debtor was a repossession by the seller, Mountain State Academy. It was being sold "as is" for $16,000, and it needed substantial work. The Debtor and his father, Ray Sapp, had previously located the mobile home, were aware of its condition, and decided that the purchase price was a good deal so long as they were willing to spend the necessary time and money to rehabilitate it.

When the Debtor received the loan proceeds from Bayer, he requested two checks – one for $16,000 to pay for the mobile home, and a second for $4,000, which the Debtor planned to use to relocate the mobile home to land owned by his father, and to make certain improvements to the mobile home and/or the real property on which the mobile home was to be situated. The Debtor purchased the mobile home on September 6, 2005 and asked that both he and his father be listed on the mobile home's certificate of title. For reasons not relevant to this record, Bayer delayed in perfecting its interest on the mobile home's

– 3 –

certificate of title, which bears the date of October 26, 2005.[3]

After a phone call from Ms. Arman regarding the submission of proof for the Debtor's stated gross monthly income – after Bayer had made the loan – the Debtor sent correspondence to her on September 25, 2005, stating that he was currently drawing unemployment and was going to "open a new claim after Oct. 3, 2005." The Debtor enclosed two pay stubs detailing gross wages of $9,709 from Hinkels and McCoy, Inc. In 2004, and a pay stub from Northern Panhandle Workforce Investment Board, Inc., which reflected a gross pay of $11,112 as of August 5, 2005. As a member of the Union, the Debtor did not have any one employer during the course of a year; rather, he was called on to perform various jobs, as needed, for various employers that utilized union labor. Thus, the Debtor's income could vary substantially from month to month and he did have periods of unemployment. The Debtor also presented an August 9, 2005 letter from the Union stating that it operates a hiring hall procedure whereby it dispatches workers to various locations throughout the United States. The Union's letter further stated that pipeline work requires that the worker be 100% healthy, with no restrictions, and that the Union had several jobs starting around September 1, 2005, on which the Debtor could be dispatched if he could be finished with his physical therapy and be ready to go to work.

On October 14, 2005, the Debtor filed his Chapter 7 bankruptcy petition. On Schedule I, he stated that he was unemployed, and that his only income was $192 per month in disability and unemployment payments. His Schedule J expenses totaled $1,830. The Debtor stated that his bankruptcy petition was precipitated by several events. First, he was injured at work and required physical therapy, during which time he was unable to be dispatched by the Union. Second, the Debtor was convicted of a crime for which he had to serve a period of home confinement.[4] Third, as a condition of his probation

---

[3] The Debtor's mobile home has two certificate of titles. The certificate of title bearing the identification number of 6739040PB bears the date of October 26, 2005. The certificate of title bearing an identification number of 67390408PA bears a date of November 3, 2005. The Debtor took possession of the mobile home on September 22, 2005.

[4] Bayer sought to introduce the Debtor's conviction of a crime pursuant to Fed. R. Evid. 609 as a basis to attack the Debtor's credibility. The crime is not one involving dishonesty, it has little to no probative value to the issues being adjudicated in this case, and the fact that the Debtor is a convicted felon did not influence the court's ultimate decision.

and/or home confinement, the Debtor was forbidden to leave the State of West Virginia, which prohibited him from being dispatched nationwide as a Union member. Fourth, the Debtor was engaged in a dissolution of marriage proceeding before filing for bankruptcy, which was complete by August 2005.

The Debtor testified that he placed title to the mobile home in his name and the name of his father, as a co-owner, because of all his father's previous help. Ray Sapp stated that he had given the Debtor large sums of money in the past to help take care of the Debtor's problems, and he was allowing the mobile home to be placed on land that belonged to him. In fact, Ray Sapp stated that, while he was not on the loan agreement with Bayer, he paid a lot of expenses for moving the mobile home on his property and for improvements made to the mobile home. Ray Sapp further stated that he would make payments on the mobile home in the event that the Debtor was unable, and he currently uses the mobile home to store some of his personal belongings.

## II. DISCUSSION

The Trustee and Bayer agree that Bayer failed to timely perfect its interest in the mobile home and that the lien on the mobile home in favor of Bayer may be avoided. Without any collateral securing the loan it made to the Debtor, Bayer seeks to except the amount of indebtedness owed to it by the Debtor from his discharge on the basis that, had the Debtor accurately relayed his gross monthly salary as of the date of the loan application or disbursement, Bayer would never have approved him for the loan. In turn, the Trustee seeks to avoid the transfer of the co-ownership interest in the mobile home to Ray Sapp as a fraudulent transfer on the grounds that Ray Sapp never paid any consideration for the acquisition of that ownership interest. For his part, the Debtor denies any actionable wrongdoing. Likewise, Ray Sapp argues that he paid consideration for the acquisition of the mobile home notwithstanding the fact that he is not obligated on the Debtor's loan agreement with Bayer.

### A.   § 523(a)(2)(B)

As alleged by Bayer, the $21,803 owed to it by the Debtor should be excepted from the Debtor's Chapter 7 discharge because the Debtor obtained the use of that money through a materially false credit application, on which Bayer relied in extending credit to him, and which false information was intended to be used to obtain a loan that the Debtor would not otherwise be entitled to receive from Bayer. Section 523(a)(2)(B) of the Bankruptcy Code provides:

– 5 –

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt–
>
> . . .
>
> (2) for money . . . to the extent obtained, by--
>
> . . .
>
> (B) use of a statement in writing--
> (i) that is materially false;
> (ii) respecting the debtor's or an insider's financial condition;
> (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied;
> (iv) that the debtor caused to be made or published with intent to deceive

§ 523(a)(2)(B).

Exceptions to a debtor's discharge are to be narrowly construed, and doubt is to be resolved in the debtor's favor. *E.g.*, *Bellco First Fed. Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir. 1997) (explaining that the rule of narrow construction is based on the "fresh start objectives of bankruptcy"). A court must also, however, "apply the plain language of [§ 523(a)(2)(B)] to the extent it is clear and unambiguous." *Mester v. Brevard (In re Brevard)*, 200 B.R. 836, 842 (Bankr. E.D. Va. 1996). The creditor seeking to have a debt excepted from discharge pursuant to 11 U.S.C. § 523(a)(2)(B) bears the burden of proof by a preponderance of the evidence. *E.g.*, *Grogan v. Garner*, 498 U.S. 279, 291 (1991) ("[W]e hold that the standard of proof for the dischargeability exceptions in 11 U. S. C. § 523(a) is the ordinary preponderance-of-the-evidence standard."); *Consolidated Bank & Trust Co. v. Dalton (In re Dalton)*, No. 99-1330, 2000 U.S. App. LEXIS 2399 at *7 (4th Cir. Feb. 17, 2000) ("A creditor attempting to exclude a debt from discharge under § 523(a)(2)(B) has the burden of proving each of these elements by a preponderance of the evidence.").

### 1. Materially False Written Statement

Bayer contends that the Debtor made a written statement that was materially false when he signed his credit application, which stated that his gross income was $3,000 per month. Bayer asserts that, at the time the Debtor filled out the loan application, his only income was from disability and unemployment, which did not exceed $192 per month. In his answer to Bayer's complaint, the Debtor admits to only receiving about $800 per month at the time he signed the credit application and loan agreement.

The Debtor does not dispute that he was not earning $3,000 per month on a yearly basis; rather,

–6–

the Debtor contends that, when he was working, he could make $3,000 per month on a yearly basis. Moreover, the Debtor argues that the question on the credit application is ambiguous inasmuch as it does not specify his sole earned gross income, or his monthly household gross income. Before August 2005, the Debtor states, he was married and his spouse earned about $800 per month. The Debtor also stated that he has a girlfriend that works.

Whether a misrepresentation is material is an issue of fact. *La Trattoria v. Lansford (In re Lansford)*, 822 F.2d 902, 904 (9th Cir. 1987). "A statement is materially false under section 523(a)(2)(B)(i) if it 'paints a substantially untruthful picture of a financial condition by misrepresenting information of the type which would normally affect the decision to grant credit.' " *Bethpage Fed. Credit Union v. Furio (In re Furio)*, 77 F.3d 622, 625 (2nd Cir. 1996) (citation omitted); *see also Candland v. Insurance Co. of N. Am. (In re Candland)*, 90 F.3d 1466, 1470 (9th Cir. 1996) (stating that material misrepresentations, for purposes of § 523(a)(2)(B), are defined as "substantial inaccuracies of the type which would generally affect a lender's or guarantor's decision.").

In this case, the court finds that the Debtor's credit application contains a materially false statement in that it lists the Debtor's gross monthly salary at $3,000 per month. The credit application unambiguously asks that the "individual applicant" list the applicant's employer, the applicant's position, and gross monthly salary. In response to these questions, the Debtor's credit application reflects that the Debtor was employed by the Union as a pipeliner/laborer, and that he had a gross monthly salary of $3,000. While the Debtor was a pipeliner, and a member of the Union (although not employed by it), the Debtor was unable to produce any evidence that he was then earning, or had earned a gross monthly salary of $3,000 on an annualized basis in either of the preceding two years. In 2004, the Debtor estimated that he earned about $16,300, and in 2005, the Debtor stated that he only received disability and marital assets for a large portion of the year.[5] Karen Palmer, Bayer's lending manager, testified that Bayer would not have approved the Debtor's loan if the credit application more accurately reflected the Debtor's annualized gross

---

[5] The Debtor also testified that he had a rental unit in Fairmont, West Virginia. The application, however, asks that the Debtor list his gross monthly salary – not investment income. Moreover, the Debtor did not demonstrate that he earned any income from the rental unit. In his bankruptcy schedules, the Debtor listed $0 in rental income.

–7–

monthly earnings.

The Debtor argues that he never wrote on the credit application that he earned a gross monthly salary of $3,000; rather, the Debtor relates that he had a conversation with Ms. Arman concerning his annual income, and that he related to her that – when he was working – he could earn income of about $36,000 per year. Because Ms. Arman filled out the information in his credit application, the Debtor contends that he should not be held liable for statements that originated with Ms. Arman.

Although Ms. Arman admitted to filling out the credit application on behalf of the Debtor, based on information told to her by the Debtor, Ms. Arman stated that when the Debtor came into her office to sign the credit application and loan documents on September 6, 2005, she asked the Debtor to review the information contained on the credit application for accuracy, and, in fact, the Debtor signed the credit application on September 6, 2006. The Debtor acknowledged that he was asked to review the information in his credit application for accuracy, but he stated that he was rushed through the process and did not take the necessary time to fully review the information contained therein.

The credit application is a short, two page document, with responses to questions neatly handwritten by Ms. Arman in standard, conspicuous print. By placing his signature on the credit application, the Debtor was certifying that everything he had stated on the application was correct. Although Ms. Arman wrote the responses on the credit application based on the answers to her questions that she asked the Debtor, he adopted those written responses by signing the document after Ms. Arman asked him to review it. *E.g.*, *In re Eckert*, 221 B.R. 40, 44 (Bankr. S.D. Fla. 1998) (stating that a debtor need not even sign a written document, so long as the debtor affirms the writing in some respect); *First Fed. Sav. & Loan Ass'n v. Kelley (In re Kelley)*, 163 B.R. 27, 35 (Bankr. E.D.N.Y. 1993) ("First Federal need not establish that the document constituting the false statement was entirely written or prepared by the Debtors. It is sufficient, as a matter of law, that the Debtors either wrote, signed or adopted such statement to conclude that the document was 'written' by them. Thus, the signatures of the Kelleys on the loan application are sufficient to satisfy the writing requirement. By signing the loan application, the Debtors adopted it as their own and used it to obtain a mortgage loan."); *In re Warmack*, 88 B.R. 399, 402 (Bankr. M.D. Fla. 1988) ("The explanation of the Debtor, Mr. Warmack, that the loan application was filled out by an officer of Chase and he merely signed the same is unacceptable as he is certainly responsible for the statements contained in the

–8–

loan application by virtue of the fact that with his signature he adopted it and warranted that the facts stated in the application were correct.").

Accordingly, because the Debtor signed the credit application, and otherwise adopted it in an attempt to obtain a loan from Bayer, the requirement that there be a written document is satisfied. Moreover, the credit application is materially false in that it lists the Debtor's gross monthly income at $3,000 per month when, at the time it was signed, the Debtor was not earning $3,000 per month, (even on an annualized basis), and in fact, he had not earned $3,000 per month on an annualized basis in either of the past two years as noted on his Statement of Financial Affairs.

### 2. Respecting the Debtor's Financial Condition

It is axiomatic that a credit application that contains statements concerning the applicant's employment and gross monthly earnings is a written document respecting the applicant's financial condition.

### 3. Reasonable Reliance

Bayer states that it reasonably relied on the information contained in the Debtor's credit application, and that it would not have made a loan to him had the credit application more accurately reflected the Debtor's true annualized gross monthly income.

The Debtor argues that he should not be liable for Bayer's own negligence in failing to verify his employment status and monthly earnings before issuing the loan to him.

Whether or not a creditor reasonably relies on a written statement respecting a debtor's financial condition "is a factual determination to be made in light of the totality of the circumstances." *BancBoston Mort. Corp. v. Ledford (In re Ledford)*, 970 F.2d 1556, 1560 (6th Cir. 1992). The creditor must actually rely on the debtor's written statement. *E.g.*, *Insurance Co. of N. Am. v. Cohn (In re Cohn)*, 54 F.3d 1108, 1115 (3rd Cir. 1995) ("[I]f it were reasonable to rely on a debtor's statement, but the creditor did not in fact rely upon the false statement, (B)(iii) would not be satisfied."). The standard is an objective one, and is based on "that degree of care which would be exercised by a reasonably cautious person in the same business transaction under similar circumstances." *Id.* at 1117. In making this determination, a court should consider three factors:

> (1) the creditor's standard practices in evaluating credit-worthiness (absent other factors, there is reasonable reliance where the creditor follows its normal business practices); (2)

the standards or customs of the creditor's industry in evaluating credit-worthiness (what is considered a commercially reasonable investigation of the information supplied by debtor); and (3) the surrounding circumstances existing at the time of the debtor's application for credit (whether there existed a "red flag" that would have alerted an ordinarily prudent lender to the possibility that the information is inaccurate, whether there existed previous business dealings that gave rise to a relationship of trust, or whether even minimal investigation would have revealed the inaccuracy of the debtor's representations).

*Id. See also Ledford*, 970 F.2d at 1560 ("Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations."); *In re Bogstad*, 779 F.2d 370, 372 (7th Cir. 1985) ("[T]he requirement of 'reasonable' reliance . . . surely does not mean that a creditor may 'assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it.' ").

In this case, the use of a credit application like the one signed by the Debtor is Bayer's standard practice in evaluating an applicant's request for a loan. While Bayer also obtains a copy of the applicant's credit report, and makes a determination concerning the value of the security given for the loan, Ms. Palmer stated that Bayer's primary consideration was an applicant's debt to income ratio. Based on a gross monthly salary of $3,000 per month, Ms. Palmer stated that the Debtor's debt to income ratio was 0.32, which qualified him for the loan. Moreover, the Debtor had a good credit score (718) and Bayer determined the value of the collateral to be about $23,000 when the loan amount was only $20,000. Ms. Palmer stated, however, that even if the Debtor had gross earnings of $2,500 per month, his debt to income ratio would have prevented him from obtaining the loan notwithstanding his good credit score and the fact that the loan amount was for less than the value of the collateral.

Regarding "red flags" that would have alerted an ordinary prudent lender to the possibility that the information supplied by the Debtor was inaccurate, the credit application itself appears to be consistent and is devoid of any indication that a further affirmative inquiry was required. *See, e.g., Rural Enters. of Okla.,*

-10-

*Inc. v Watson (In re Watson)*, No. 02-90, 2003 Bankr. LEXIS 516 at *19-20 (B.A.P. 10th Cir. May 29, 2003) (holding that to require a creditor to affirmatively investigate numerous documents to verify the accuracy of a financial statement – that it had no reason to question – went "beyond the reasonableness required by § 523(a)(2)(B)."); *Global Express Money Order, Inc. v. Davis (In re Davis)*, 262 B.R. 673, 681 (Bankr. E.D. Va. 2001) (holding that a three-month old financial statement was not a sufficient red flag that would require the creditor to make a further inquiry); *Staten Island Sav. Bank v. Scarpinito (In re Scarpinito)*, 196 B.R. 257, 264 (Bankr. E.D.N.Y 1996) (holding that the creditor was not required to investigate known inaccuracies concerning the financial statements of business entities run by the debtor when the creditor was lending money to the debtor on a personal basis); *FDIC v. Reisman*, 149 B.R. 31, 39 (Bankr. S.D.N.Y. 1993) ("This court rejects the debtor's argument that the bank did not reasonably rely on the statements because it did not verify all of the information contained therein.").

      Of course, Ms. Arman specifically stated that she requested the Debtor to provide verification of his gross monthly salary, on an annualized basis, when he came to her office to sign his credit application. Notwithstanding the fact that the Debtor did not bring that verification with him, Ms. Arman and Bayer elected to proceed with issuing the loan to him. Several factors are present in this case, however, that would make Bayer's reliance on the statements in the Debtor's credit application reasonable within the context of § 523(a)(2)(B)(iii). First, the Debtor's sister worked for Bayer, so the loan that Bayer was making was to a family member of an employee. Second, the Debtor had a previous loan with Bayer, which he had paid in full. Third, the Debtor's father and brother had both financed other purchases through Bayer without any problems. Fourth, the Debtor has a good credit score, and there was no indication based on the Debtor's credit report or past history with Bayer that the Debtor was a credit risk. Fifth, the value of the collateral exceeded the amount of the loan. Sixth, Ms. Arman was familiar with the way union members were employed, and she knew that a union member's income could vary substantially from month to month as work was available, and that a union member may have several employers during the course of a year. Seventh, Ms. Palmer testified that verification of employment status and gross monthly salary was not a requirement for Bayer to make a loan to a customer. Finally, Ms. Arman stated that she just "trusted" the Debtor to tell her the truth, considering her conversation with the Debtor, his family connection to Bayer, and his past course of dealing. Based on these facts, the Debtor's failure to bring salary

-11-

verification with him on September 6, 2006, was not a sufficient "red flag" that would require Bayer to make a further inquiry into the Debtor's gross monthly salary, or that would make Bayer's reliance on the Debtor's credit application unreasonable.

### 4. Intent to Deceive

Bayer contends that the Debtor led Ms. Arman to believe that he earned about $36,000 per year in jobs performed as a union member, when, in fact, the Debtor had only earned $16,334 in 2004, $9,095 in 2003, and for the calendar year of 2005, he only earned $13,242. Bayer states that the Debtor signed the credit application, which stated that his gross monthly salary was $3,000, because he wanted a loan from the Bayer to purchase the mobile home, which he would not have been otherwise qualified to receive.

The Debtor argues that he told Ms. Arman the truth – when he was working, he could earn about $36,000 per year. Moreover, the Debtor states that Bayer never had any problems with his credit application until after the Trustee sought to avoid Bayer's lien in his mobile home as being untimely perfected. The Debtor claims to be Bayer's scapegoat for Bayer's own mistake in failing to timely perfect its interest in the mobile home.

Because a debtor will rarely admit to an intent to deceive a creditor, courts have "held that intent to deceive under § 523(a)(2)(B) can be inferred from the totality of the circumstances surrounding the debtor's acts, including the debtor's knowledge of or reckless disregard for the accuracy of his financial statements." *Dalton*, 2000 U.S. App. LEXIS 2399 at *9 (citing *In re Cohn*, 54 F.3d 1108, 1119 (3rd Cir. 1995) ("[A] creditor can establish intent to deceive by proving reckless indifference to, or reckless disregard of, the accuracy of the information in the financial statement of the debtor when the totality of the circumstances supports such an inference."); *In re Miller*, 39 F.3d 301, 305 (11th Cir. 1994) ("Reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation may combine to produce the inference [sic] of intent [to deceive].") (quoting *In re Albanese*, 96 B.R. 376, 380 (Bankr. M.D. Fla. 1989) (correction in original)); *In re Batie*, 995 F.2d 85, 90 (6th Cir. 1993) ("Section 523(a)(2)(B)(iv) is met if a debtor is reckless when submitting financial statements that he knows are not true, not only if the debtor possesses a subjective intent to deceive.")).

Here, when the Debtor spoke with Ms. Arman on September 2, 2005, and when he signed his

-12-

credit application and loan documents on September 6, 2005, the Debtor was on unemployment, he was receiving disability pay for an injury he had sustained, and he had just gotten a divorce from a working spouse. Also, the Debtor stated that he was prohibited from working outside the State of West Virginia as a condition of his confinement and/or parole. Before applying for the loan in September 2005, the Debtor had only worked on one union jobs that year which had paid him $11,112. Bayer estimates that the Debtor's total income for 2005 was $13,242. In 2004 his income was about $16,334, and in 2003 his income was about $9,095. Consequently, when he applied for the loan with Bayer, the Debtor was not making $36,000 per year. Although the Debtor stated that he never told Ms. Arman that he earned $3,000 per month, Ms. Arman stated that she calculated that figure based on the conversation she had with the Debtor. If it was wrong, Ms. Arman stated, then the Debtor should have corrected it when she asked him to review the information on his credit application for accuracy. The Debtor stated that he signed his credit application without reading it.

Based on the totality of the circumstances of this case, the court finds that Bayer demonstrated by a preponderance of the evidence that the Debtor acted with the requisite intent to deceive, as required by 11 U.S.C. § 523(a)(2)(B)(iv). The Debtor had just gotten divorced, he was on unemployment and disability, and was prohibited from working outside the State of West Virginia. He and his father had located a repossessed mobile home for sale, which the two of them believed to be a good deal. The Debtor was going to live in that home, and he wanted to facilitate its purchase. The Debtor knew that he was not working for pay when he applied for the loan, but he believed that, with this potential earning capacity as a member of the Union, and with the help of his father if the need arose, he could make the required payments on the mobile home and Bayer would not be injured if he did not accurately disclose his gross monthly salary, on an annualized basis, as of the date he applied for the loan. While the court does not doubt the sincerity of the Debtor in his asseveration that he always intended to repay Bayer, and that the loan would be current but for Bayer's failure to timely perfect its interest in the mobile home, that does not excuse the Debtor from misleading Bayer regarding his gross monthly earnings.

Moreover, the Debtor's argument that he should not be held responsible for the entry of the $3,000 gross monthly salary statement on his credit application because he did not take the time to read the credit application must also fail as a matter of law. Ms. Arman specifically asked the Debtor to review the

-13-

information on the credit report for accuracy. The information that Ms. Arman inserted was plain, easy to read, and conspicuous. The Debtor is a bright, college educated individual, who assiduously represented himself at trial. A cursory review would have disclosed the $3,000 gross monthly salary entry and common sense dictates that an applicant's income is an important factor in lender's decision to issue a loan. *See, e.g.*, *Merchants Bank of Cal. v. Chai Cho Oh (In re Oh)*, 278 B.R. 844, 860 (Bankr. C.D. Cal. 2002) ("A debtor cannot escape liability under section 523(a)(2)(B) by firmly putting his head in the sand and later claiming not to have known of the falsity of representations that were made on his behalf while his head was covered. Such conduct is sufficiently reckless to give rise to nondischargeable liability under section 523(a)(2)(B)."); *In re Hall*, 109 B.R. 149, 155 (Bankr. W.D. Pa. 1990) (discrediting a debtor's defense that she was unaware of any inaccuracies in her financial statements submitted to obtain a loan when the debtor had entrusted her son to handle her financial affairs because "even if she did not actually know that it was inaccurate, she should have known that it was inaccurate and, at the very least, she was recklessly indifferent as to its accuracy.").

Accordingly, the Debtor acted with the requisite intent to deceive Bayer by submitting a credit application that materially misrepresented his gross monthly salary in effort to induce Bayer into extending credit to him. Having established all the required element to prevail on a § 523(a)(2)(B) cause of action to except a debt from discharge by a preponderance of the evidence, the court will enter a final judgement in Bayer's favor.

**B.     Fraudulent Transfer**

The Trustee asserts that the Debtor transferred an ownership interest to his father in the mobile home, without consideration, shortly before filing bankruptcy; thus, the Trustee argues that the father's ownership interest in the mobile home is an avoidable fraudulent transfer under § 548 of the Bankruptcy Code.

The Debtor and his father, Ray Sapp, state that, even though Ray Sapp is not an obligor on the loan that the Debtor obtained to purchase the mobile home, he nevertheless paid consideration for having his name on the title on the basis that he paid for a lot of the moving and refurbishing costs for the mobile home.

Before its amendment in 2005, § 548 of the Bankruptcy Code provided:

(a)(1) The trustee may avoid any transfer . . . of an interest of the debtor in property . . .

-14-

that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily–

. . .

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation . . . .

11 U.S.C. § 548(a)(1)(B).

Here, it is undisputed that the Debtor purchased a mobile home with loan proceeds obtained from Bayer. His father was not an obligor on the loan obtained to purchase the mobile home, but his father is listed on the title to the mobile home as a co-owner. Also undisputed is that the Debtor made that transfer to his father within one year before the date that the Debtor filed his bankruptcy petition, and that the Debtor was insolvent at the time the transfer was made. Accordingly, the only avoidance issue is whether Ray Sapp gave "value" in exchange for his ownership interest, and if so, whether that "value" was reasonably equivalent to Ray Sapp's co-ownership interest.

"Value" given in exchange for receiving a co-ownership interest may be either direct, indirect, or intangible. *Mellon Bank, N.A. v. Official Comm. of Unsecured Creditors of R.M.L, Inc. (In re R.M.L., Inc.)*, 92 F.3d 139, 150 (3rd Cir. 1996). The applicable "date for defining such reasonable equivalence is the date of the transfer." *Cooper v. Ashley Communications, Inc. (In re Morris Communications NC, Inc.)*, 914 F.2d 458, 466 (4th Cir. 1990); *Peltz v. Hatten (In re USN Communications, Inc.)*, 279 B.R. 710, 738 (D. Del.) ("[I]t is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight."), *aff'd* 60 Fed. Appx. 410 (3rd Cir. 2003). A determination of whether "value" is "reasonably equivalent" is based on the totality of the circumstances. *R.M.L., Inc.*, 92 F.3d at 153-54.

The term "value" is specifically defined in § 548 to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor." 11 U.S.C. § 548(d)(2)(A). Thus, under this definition, when a family member fulfills a natural obligation to support to a non-minor debtor in the debtor's endeavors, that family member generally does not provide a "value" sufficient to forestall a fraudulent transfer action. *See,*

-15-

*e.g.*, *In re Treadwell*, 699 F.2d 1050, 1051 (11th Cir. 1983) ("[L]ove and affection are clearly insufficient to protect the transfers from the Trustee. . . . The object of section 548 is to prevent the debtor from depleting the resources available to creditors through gratuitous transfers of the debtor's property."); *Morris v. Vansteinberg (In re Vansteinberg)*, No. 02-5151, 2003 Bankr. LEXIS 2069 at *9-12 (Bankr. D. Kan. Nov. 26, 2003) (holding that a transfer of an interest in an automobile to a spouse on the eve of bankruptcy was fraudulent, and the spouse's argument that she provided consideration by foregoing employment outside the home to take care of the family was not "value" pursuant to § 548(a)(2)(A)); *Lawson v. Barden (In re Skalski)*, 257 B.R. 707, 713-14 (Bankr. W.D.N.Y. 2001) ("[T]o permit an insolvent person to transfer a $35,000 asset to a close family member, and then let them pick which ordinary and just obligations the family member will pay thereafter as "consideration" for the transfer, would be to permit transfers among family members that place valuable assets beyond the reach of creditors in violation of fraudulent transfer laws."); *but see* 37 Am. Jur. 2d *Fraudulent Conveyances and Transfers* § 28 (2006) ("[T]ransfers in consideration of services to be rendered in the future have been held invalid as to existing creditors by some courts, although other courts have held that executory promises may constitute 'property' and 'fair consideration.' ").

In this case, Ray Sapp detailed numerous expenses he paid for that related to the moving and rehabilitation of the mobile home. For example, Ray Sapp paid $1,500 to have the mobile home moved; $800 in labor costs; $675 to make the mobile home payments to Bayer for the months of December 2005, January 2006, and February 2006; and he paid for various home improvement store purchases, food, and maintenance costs. In total, Ray Sapp claims to have spent about $4,133 on behalf of the Debtor for expenses related to the mobile home – in addition to allowing the mobile home to be placed on his real property.

Importantly, neither Ray Sapp nor the Debtor identified a contract whereby, in exchange for the Debtor's grant of a co-ownership interest in the mobile home, Ray Sapp would be obligated to make certain payments or repairs. Based on the testimony received at trial, the court is convinced that Ray Sapp wished to assist his son based on their family relationship, and that he would have done what was necessary to see that the Debtor had a home in which to live. In doing so, Ray Sapp was fulfilling his natural obligation as a father. The court does not believe that the Debtor could have sued his father to provide that

support in the event that Ray Sapp refused to pay for certain expenses or withdrew his support for his adult son. Consequently, the court is not convinced that Ray Sapp's interest in the mobile home is based on "value" as defined by § 548(d)(2)(A) of the Bankruptcy Code, or that any purported value that was exchanged at the time of the transfer was the reasonable equivalent of Ray Sapp's co-ownership interest in the mobile home.

Accordingly, the court will enter a judgment in favor of the Trustee on his fraudulent transfer complaint. This does not necessarily mean, however, that Ray Sapp cannot recover at least some of his costs and expenses related to the Debtor's acquisition of the mobile home. To the extent that the expenses incurred by Ray Sapp can be deemed to be the "actual, necessary costs and expenses of preserving the estate," Ray Sapp may file an administrative expense claim pursuant to 11 U.S.C. § 503(b)(1)(A). Pursuant to Fed. R. Bankr. P. 3002(c)(3), Ray Sapp would have 30 days to file a claim after this judgment becomes final.

### III. CONCLUSION

The court will enter a separate order in the above-captioned adversary proceedings pursuant to Fed. R. Bankr. P. 9021 that avoids Bayer's security interest in the mobile home, avoids Ray Sapp's ownership interest in the mobile home, and excepts the debt owed by the Debtor to Bayer from the Debtor's discharge.